IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Filed in Open Court
5-23-24
Skyler B. O'Hara
By ___TVN___
Deputy

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 24-cr-20047-DDC/TJJ |
| TYLER BROWN | |
| Defendant. | |

**PLEA AGREEMENT PURSUANT TO FEDERAL RULE
OF CRIMINAL PROCEDURE 11(c)(1)(C)**

The United States of America, by and through Assistant United States Attorneys Faiza H. Alhambra and Jabari Wamble, and the defendant Tyler Brown, personally and by and through his counsel, Ellen Comley, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure:

1. **Defendant's Guilty Plea.** The defendant agrees to plead guilty to Count 1 of the Information charging a violation of 18 U.S.C. § 1962(d), that is, Racketeering Conspiracy. By entering into this plea agreement, the defendant admits to knowingly committing the offense, and to being guilty of the offense. The defendant understands that the maximum sentence which may be imposed as to Count 1 of the Information to which he has agreed to plead guilty is not more than 20 years of imprisonment, a $250,000 fine or, if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, 3 years of supervised release, and a $100.00 mandatory special assessment.

1

2. **Factual Basis for the Guilty Plea.** The parties agree the facts constituting the offense to which the defendant is pleading guilty are as follows:

a. The International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmith, Forgers and Helpers ("the Boilermakers Union" or "International Brotherhood") is a labor union that was headquartered in Kansas City, Kansas until 2023 with approximately 45,000 members consisting of skilled tradespersons and allied workers who fabricate and maintain steam boilers and engines for industrial, maritime, and railway uses. The Boilermakers Union is also the majority owner of the Bank of Labor, a financial institution headquartered in Kansas City, Kansas ("the Bank of Labor").

b. The Boilermakers Union represents members in collective bargaining with employers throughout the United States and Canada with respect to wages, hours, grievances, and other terms and conditions of employment and is therefore a labor organization engaged in industries affecting interstate and foreign commerce subject to the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §402 (i) and (j). Pursuant to that representation, the Boilermakers Union has executed collective bargaining agreements with employers covering work performed in several states and Canadian provinces.

c. The officers, employees and representatives of a labor organization subject to the LMRDA are fiduciaries "in relation to such organization and its members as a group" and are required to "hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder." 29 U.S.C. § 501(a) (1959). The Boilermakers Union is governed by a constitution adopted at a convention of its delegates held every five years ("the Boilermakers Union Constitution"). The most recent version of the Boilermakers Constitution was adopted at the Boilermakers Union Convention in 2021.

d. Article 5.2 of the Boilermakers Union Constitution provides that the Boilermakers Union's Executive Council, composed of the International President and five International Vice Presidents, has the power to "authorize all expenditures deemed necessary to effectuate or accomplish the objectives of this International union, as set forth in Article 1.2 and other applicable provisions of the union's Constitution, or for its benefit." Article 7.1.1 of the Boilermakers Union Constitution states that the union's "International President shall countersign all orders for payment of money, and shall have authority to make such expenditures from the funds of the International Brotherhood as are necessary for the protection of its interests and the achievement of its objectives as approved by the Executive Council."

e. Newton Jones was appointed International President of the Boilermakers Union in 2003 and was reelected as International President at the 2006, 2011, 2016, and 2021 conventions of the Boilermakers Union. On June 2, 2023, Newton Jones was removed as International President and expelled as a member of the Boilermakers Union following an internal disciplinary proceeding pursuant to Article 17 of the Boilermakers Union Constitution in which the Executive Council found him guilty of financial misconduct involving use of Boilermakers

Union funds for unauthorized international travel, payments to his wife in the guise of employment, and non-union related restaurant meals during the period from 2015 until 2023.

  f. Defendant TYLER BROWN ("BROWN") was employed by the Boilermakers Union as Executive Director of Industrial Sector Operations ("ISO") of the Boilermakers Union from at least 2013 through 2018. The ISO Executive Director is appointed by the International President pursuant to Article 21 of the Boilermakers Union Constitution. From 2016 to 2018, Defendant BROWN also served as Special Assistant to the International President of the Boilermakers Union, Newton Jones. From 2018 to November 1, 2022, Defendant BROWN also served as Chief of Staff of the Boilermakers Union. From 2018 to 2022, BROWN held all three positions simultaneously and reported directly to Newton Jones. BROWN communicated frequently and directly with President Newton Jones in order to carry out Jones' directives.

  g. BROWN was assigned to the Boilermakers Union in its headquarters in Kansas City, Kansas for his entire tenure. Newton Jones resided in Chapel Hill, North Carolina and worked from an office there which was owned and maintained by the Boilermaker's Union. Jones resided in Chapel Hill. Jones traveled extensively, domestically and internationally, and rarely visited the Boilermaker's Union headquarters. As a result, BROWN's presence in the Kansas City office allowed Jones to carry out Jones' directives while being absent from the day-to-day management of the Boilermakers Union. From February 2013 through October 2022, BROWN functioned as the highest authority in the President's office in Kansas City headquarters during Jones' frequent absences and was responsible for implementing all of Jones' directives.

  h. Because of the importance of BROWN's roles, he was aware of Jones' schedule and whereabouts. Beginning in February 2013, BROWN was aware that Jones, who was around 61 years old had married a 19 year-old woman, Kateryna Anatolia, who lived in Ukraine and that Jones and the woman would travel together in the Ukraine and other cities in Europe for weeks at a time at Boilermakers Union expense when those expenses were not necessary to conduct union business and did not benefit the Boilermakers Union and its members. BROWN was also aware that Jones spent Boilermakers Union funds on lavish expenses including private jet flights, upscale restaurants meals, expensive wines, and upscale hotel accommodations which were not necessary to conduct union business and did always benefit the union and its members.

  i. When Kateryna Jones accompanied Newton to the United States in 2015, Jones directed BROWN and another Boilermakers Union employee to compensate Kateryna Jones with back-payments for alleged work Kateryna Jones purportedly performed for the Boilermakers Union in Ukraine from 2013 to 2015. BROWN suspected that Kateryna Jones had not performed any work for the Boilermakers Union while in Ukraine, and Jones did not identify for BROWN any work Kateryna Jones purportedly performed for the Boilermakers Union in Ukraine. BROWN complied with Jones's direction to have two wire transfers of Boilermakers Union funds made to Kateryna Jones totaling more than $70,000, as well as making several thousands of contributions on her behalf to the Boilermakers Union officers' pension funds and the United States Railroad Retirement Board. For the period from 2013 through July 2023, with BROWN's assistance, the Boilermakers Union paid Kateryna Jones nearly $2,000,000 in cumulative salary, reimbursed expenses, and benefit contributions for minimal or no productive work.

3

j.    BROWN was aware that Jones liked to travel internationally at the Boilermakers Union's expense when such travel was not always necessary to conduct union business or otherwise benefit the union and its membership. BROWN was aware that Jones liked to travel internationally with Kateryna Jones and large entourages of members of his family, officers and employees of the Boilermakers Union, officials of the Bank of Labor, and outside guests whose travel was not always necessary to conduct union business or benefit the union and its members. These groups lead by Jones would stay in upscale hotels, eat at lavish restaurants, and take expensive tours and side trips at Boilermakers Union expense. Based on BROWN's own admissions and records of the Boilermakers Union, Jones and other officers of the Boilermakers Union unlawfully converted millions of dollars of union funds in this manner to the travelers' unauthorized personal use.

k.    BROWN was aware that Jones supplied no legitimate union-related purpose for many of the international trips at the Boilermakers Union's expense. BROWN was also aware that Jones also used several pretexts to justify those international trips when the trips and all the related expenses were not necessary to conduct union business, satisfy the Boilermakers Union's objectives or otherwise benefit the union and its membership. For example, BROWN was aware Jones directed large groups to travel to Italy on at least seven (7) occasions between 2014 and 2022 to attend conventions or other meetings of FLAEI, a small Italian union of electrical workers, and to conduct other alleged Boilermakers Union business in Italy. In May 2014, Jones directed BROWN and another Boilermakers Union employee to travel to a FLAEI meeting for nine (9) days at the Boilermakers Union's expense. In May 2017, Jones directed a fourteen (14) person entourage at the Boilermakers Union's expense—including five (5) members of his family--to attend the quadrennial convention of FLAEI. Although the convention only lasted four days, the Jones-led entourage stayed in Sardinia for seven days and visited Rome for two additional days at the Boilermakers Union's expense. BROWN was aware that Jones invited persons to travel on these trips whose participation served no legitimate union-related purpose and directed participating union officials assigned by Jones to accompany him on those trips to extend their travel for lengths of time that exceeded any business purpose that the travel might have required.

l.    According to BROWN, Jones would gain the loyalty of Boilermakers Union employees by selecting them for travel to international destinations at the Boilermakers Union's expense when such travel was not necessary to conduct union-related business and satisfy the union's objectives or otherwise benefit the union and its membership. In order to assist Jones, BROWN directed administrative secretaries in the President Jones' office to prepare letters for Jones' approval which assigned Boilermakers Union employees to travel on more than one hundred (100) such trips from 2013 through 2022. For example, BROWN and another Boilermakers Union employee traveled to Frankfurt, Germany for seven (7) days to attend a conference of unions in industries related to the production of textiles, garments, shoes, and leather. Between 2013 and October 2022, BROWN personally made more than thirty (30) such trips to international destinations such as Spain, Switzerland, Peru, Thailand, Cambodia, Brazil, and Australia. BROWN was aware these trips were not necessary to conduct union business and provided little or no benefit to the Boilermakers Union. Based on BROWN's own admissions, Jones' assignment of Boilermakers Union officers and employees on these trips, with BROWN's assistance and participation, unlawfully converted millions of dollars of the Boilermaker Union's funds to the travelers' unauthorized personal use in this manner.

m.    On these international trips, Jones specified a level of transport, accommodation,

4

and food for himself, his family, and other travelers at Boilermakers Union expense that exceeded what was necessary to accomplish any possible union purpose; Jones assigned and invited more travelers at Boilermakers Union expense than necessary to accomplish any possible union purpose; Jones directed that travelers engage in side trips and other entertainment at Boilermakers Union expense that were not necessary to accomplish any possible union purpose; and Jones allowed himself, his family, and other travelers additional days overseas at Boilermakers Union expense that were not necessary to accomplish any possible union purpose and without using vacation time.

n.  At Jones' direction, BROWN's assisted him in hiring six (6) Jones family members to "staff" positions in the Boilermakers Union without having the family members apply and compete for the positions and for which they received salaries and benefits more than double their market value for which the family members performed few if any duties and could report to work as they pleased. Those family members each traveled internationally at the Boilermakers Union's expense as well as to domestic destinations such as Maui, Hawaii and Key West, Florida when such travel was not always necessary to conduct union business, satisfy the union's objectives or otherwise benefit the union and its membership. In addition, union funds were used to pay tuition and relocation expenses, including several years of rent payments, in excess of $200 for some of these family members.

o.  Based on BROWN's admissions, BROWN assisted Jones as International President of the Boilermakers Union to accumulate power resulting in de-facto one- man rule within the union. Jones personally directed all hiring decisions, requiring all employees to annually reapply and be reappointed to their positions, and determined all salaries, annual raises, and reductions in pay. Jones would release five-years of financial information concerning the Boilermakers Union and five-years of Executive Council minutes just prior to each quinquennial Boilermakers Union Convention in order to consolidate his authority as to diminish any effective opposition at the convention. Jones would control which business came before the convention, and in which order, and relied upon public voice votes in order to consolidate his authority and to diminish any effective opposition at the convention.

p.  Jones selected all the International Vice-Presidents on the Executive Council who would serve the unexpired terms of resigning officers and then run for election on a slate of candidates with Jones. Jones frequently selected each of these International Vice-Presidents from among the group of international staff whom Jones had earlier appointed as employees of the Boilermakers Union under Article 7.4 of the Boilermakers Union Constitution. When faced with any actual or perceived opposition to his authority, Jones would remove individuals from their employee positions, reduce their salary, and/or fire them or other employees with whom they worked closely.

q.  With BROWN's assistance, Jones ignored or violated established policies of the Boilermakers Union with which Jones disagreed or those policies which would prevent him from unlawfully enriching himself, his allies, or his family members at the union's expense. For example, in or about 2015, the Executive Council of the Boilermakers Union duly adopted a new vacation policy which required all International Officers and staff to take at least two weeks of vacation per year or else such vacation was forfeited and would not be allowed to be carried over from year-to-year. Jones directed BROWN to put the new policy on hold indefinitely and BROWN complied.

  r. As a result of BROWN's failure to enforce the Executive Council's vacation policy, Jones, Kateryna Jones, and other officers and employees of the Boilermakers Union were able to receive vacation pay and accompanying benefits for hundreds of hours of vacation time which they would not have received if the 2015 policy had been implemented and enforced. As Chief of Staff, BROWN approved vacation payments requested by Jones, Kateryna Jones, and Secretary-Treasurer William Creeden, and other Boilermakers Union officers and employees, knowing that such payments were contrary to the 2015 vacation policy. BROWN personally requested and received several weeks of vacation pay for many years, knowing it was contrary to the 2015 vacation policy. As a result, Jones, Kateryna Jones, Secretary-Treasurer William Creeden, BROWN and other officer and employees unlawfully converted more than one million dollars from the Boilermakers Union to the recipients' unauthorized use in this manner.

  s. According to Articles 5.2 and 7.1.1 of the Boilermakers Union Constitution, described above, all expenditures of the Boilermaker Union's funds by the International President and International Secretary-Treasurer are subject to the approval of the Executive Council. Under Article 9.1 of the Boilermakers Union Constitution the International Secretary Treasurer "shall pay all warrants drawn on the treasury when properly countersigned by the International President; shall submit all bills to the International President for approval, except for those of a routine, fixed, or recurring nature, such as for service and supplies; shall purchase, when authorized, all supplies necessary to conduct the business of the International Brotherhood."

  t. In his various positions in the Boilermakers Union, BROWN would attend meetings of the union's Executive Council, and as Chief of Staff, BROWN was responsible for preparing the agenda package of related materials for the council members for those meetings. At Jones' direction, BROWN eventually removed the standing items of reviewing the expenses of the International President and International Secretary-Treasurer from the International Executive Council Docket. As a result, Newton and Kateryna Jones unlawfully converted close to $225,000 of the Boilermakers Union's funds in credit card charges for restaurant meals in their hometown of Chapel Hill and other merchandise that were not necessary to conduct union business, satisfy the union's objectives or benefit the Boilermakers Union and its members.

  u. According to Article 4.7 of the Boilermakers Union Constitution, any full- time salaried officer or appointed representative of the International Brotherhood or of a subordinate body who shall engage in any business outside of the regular duties of the International Brotherhood shall immediately upon engaging in such outside business resign or apply for leave of absence and vacate the office, provided that the Executive Council may permit exceptions to the above. Although it was generally known that Jones served as Chairman/CEO of Bank of Labor and William Creeden served as Senior Executive Vice President, minutes of the Executive Council meetings show Jones and Creeden never disclosed their salaries (Newton Jones $498,000 and William Creeden $442,000 in 2022 respectively) and the Executive Council never permitted them an exception. In addition, Jones and Creeden omitted their Bank of Labor salaries when they falsified the Labor Organization Officer and Employee Report Form LM- 30 in violation of 29 U.S.C. § 439(b) and 439(d).

  3. **Proposed Rule 11(c)(1)(C) Sentence.** The parties propose, as an appropriate disposition of the case:

6

(a) A sentence not to exceed 60 months of imprisonment;

(b) The parties agree that the defendant should be sentenced pursuant to USSG § 2E1.1. giving him a base offense level of 19;

(c) The government agrees to recommend no fine;

(d) The government agrees to recommend no forfeiture;

(e) The government agrees to recommend no restitution;

(f) The mandatory special assessment of $100.00;

(g) The parties agree that the defendant is banned from employment by a labor union, ERISA fund, or any other positions covered by 29 U.S.C. §§ 504 and 1111;

(h) The government agrees to not file any additional charges against the defendant arising out of the facts forming the basis for the present Information; and

(i) to recommend the defendant receive a two (2) level reduction in the applicable offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility. In addition, if his offense level is 16 or greater, prior to any reduction for acceptance of responsibility, and the Court finds he qualifies for a two-level reduction, the United States will move at the time of sentencing for an additional one-level reduction for acceptance of responsibility because he timely notified the government of his intention to enter a plea of guilty.

The parties seek this binding plea agreement as an appropriate disposition of the case, because if the Court permits itself to be bound by the proposed sentence, it brings certainty to the sentencing process; it assures that the defendant and the government will benefit from the bargain they have struck; it serves the interests of justice; and it assures a sentence consistent with the sentencing factors of 18 U.S.C. § 3553(a). ==If the Court does not agree with the sentence, the defendant and==

7

United States may be restored to the positions they maintained prior to reaching this plea Agreement. This plea agreement centers on the defendant's agreement to enter his guilty plea as soon as the Court's schedule permits, thereby preserving valuable Court, prosecution, defense, United States Probation Office, United States Marshals' Service and other law enforcement resources.

4. **Application of the Sentencing Guidelines.** The parties are of the belief that the proposed sentence does not offend the advisory sentencing guidelines. Because this proposed sentence is sought pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties are not requesting imposition of an advisory guideline sentence.

5. **Consequences for Violating the Plea Agreement.** The United States' obligations under this plea agreement are contingent upon the defendant's continuing to manifest an acceptance of responsibility. If the defendant denies or gives conflicting statements as to his involvement, falsely denies or frivolously contests relevant conduct the Court determines to be true, willfully obstructs or impedes the administration of justice, as defined by U.S.S.G. § 3C1.1 (or willfully attempts to do so), or has engaged in additional criminal conduct, the United States reserves the right to petition the Court for a hearing to determine if he has breached this plea agreement.

If the Court finds by a preponderance of the evidence that the defendant (1) has breached or violated this plea agreement; (2) has willfully obstructed or impeded the administration of justice, as defined by U.S.S.G. § 3C1.1 (or willfully attempted to do so); (3) has engaged in additional criminal conduct; or (4) has otherwise failed to adhere to this plea agreement's terms, this plea agreement will be deemed null and void, and the United States may pursue any additional

charges arising from the criminal activity under investigation, as well as any charges for any perjury, false statement, or obstruction of justice that may have occurred.

If the Court finds the defendant has violated this plea agreement, he understands and agrees that all statements he made, any testimony he gave before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against him in any and all criminal proceedings. The defendant waives any rights which might be asserted under the United States Constitution, any statute, Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, or any other federal rule that pertains to the admissibility of any statements he made subsequent to this plea agreement.

6. **Whether to Accept the Proposed Plea Agreement and Sentence is Up to the Court.** The Court has no obligation to accept the proposed plea agreement and sentence. It is solely within the Court's discretion whether to accept the proposed binding plea agreement as an appropriate disposition of the case.

7. **Withdrawal of Plea Permitted Only if the Court Does Not Accept the Plea Agreement and Proposed Sentence.** If the Court agrees to be bound by the proposed plea agreement and sentence, the parties shall be bound by all the terms of the proposed plea agreement and the defendant will not be permitted to withdraw his guilty plea. If the Court announces that it will NOT be bound by the proposed plea agreement, the parties agree that at that time either party may withdraw the proposed plea agreement, and if either does so, then all parties will be restored to the positions they were in prior to the entry of the defendant's plea. If neither party elects to withdraw the proposed plea agreement at the time the Court announces that it will not be bound, and before the Court proceeds with sentencing, then the parties shall be bound by all the terms of the proposed plea agreement and the defendant will not be permitted to withdraw his guilty plea.

9

8. **Payment of Special Assessment.** The defendant understands that a mandatory special assessment of $100.00 per count of conviction will be entered against him at the time of sentencing. The defendant agrees to deliver to the Clerk of the United States District Court payment in the appropriate amount no later than the day of sentencing. The defendant has the burden of establishing an inability to pay the required special assessment. The parties acknowledge that if the Court finds the defendant is without resources to pay the special assessment at the time of sentencing, the Court may allow payment during his period of incarceration.

9. **Waiver of Appeal and Collateral Attack.** The defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, his conviction, or the components of the sentence to be imposed herein. The defendant is aware that 18 U.S.C. § 3742 affords him the right to appeal the conviction and sentence imposed. By entering into this agreement, the defendant knowingly waives any right to appeal a sentence imposed in accordance with the sentence recommended by the parties under Rule 11(c)(1)(C). The defendant also waives any right to challenge his sentence, or the manner in which it was determined, or otherwise attempt to modify or change his sentence, in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 (except as limited by *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001)), or a motion brought under Federal Rule of Civil Procedure 60(b). In other words, the defendant waives the right to appeal the sentence imposed in this case, except to the extent, if any, the Court imposes a sentence in excess of the sentence recommended by the parties under Rule 11(c)(1)(C). However, if the United States exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may appeal the sentence received, as authorized by 18

10

U.S.C. § 3742(a). Notwithstanding the foregoing waivers, the parties understand that the defendant in no way waives any subsequent claims with regards to ineffective assistance of counsel or prosecutorial misconduct.

10. **FOIA and Privacy Act Waiver.** The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552. The defendant further waives any rights conferred under the Privacy Act of 1974, 5 U.S.C. § 552a, to prevent or object to the disclosure of records or materials pertaining to this case.

11. **Waiver of Claim for Attorney's Fees.** The defendant waives all claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

12. **Full Disclosure by United States.** The defendant understands the United States will provide to the Court and the United States Probation Office all information it deems relevant to determining the appropriate sentence in this case. This may include information concerning his background, character, and conduct, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he is pleading guilty. The United States may respond to comments he or his attorney makes, or to positions he or his attorney takes, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The defendant also has the right to provide information concerning the offense and to make recommendations to the Court and the United States Probation Office.

11

13. **Parties to the Agreement.** The defendant understands this plea agreement binds only him, the United States Attorney for the District of Kansas and the Department of Justice Criminal Division, and that it does not bind any other federal, state, or local prosecution authority.

14. **Voluntariness of Guilty Plea.** The defendant has had sufficient time to discuss this case, the evidence, and this Plea Agreement with his attorney and he is fully satisfied with the advice and representation his attorney provided. Further, the defendant acknowledges that he has read the Plea Agreement, understands it, and agrees it is true and accurate and not the result of any threats, duress or coercion. The defendant further understands that this Plea Agreement supersedes any and all other agreements or negotiations between the parties, and unless subsequently supplemented in writing with the joint approval of the parties, this Plea Agreement embodies each and every term of the agreement between the parties. The defendant acknowledges that he is entering into this Plea Agreement and is pleading guilty because he is guilty. He further acknowledges that he is entering his guilty plea freely, voluntarily, and knowingly.

/s/ Faiza H. Alhambra                                  Date: 5/15/2024
Faiza H. Alhambra
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
913-551-6904
913-551-6541 (fax)
Faiza.Alhambra@usdoj.gov
Kan. S. Ct. No. 24525

/s/ Jabari Wamble                                      Date: 5/15/2024
Jabari Wamble
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
913-551-6608
913-551-6541 (fax)
Jabari.Wamble@usdoj.gov
Kan. S. Ct. No. 22730

/s/ *Vincent Falvo*  
Vincent J. Falvo, Jr.  
Senior Trial Attorney  
Violent Crime and Racketeering Section  
United States Department of Justice  
1301 New York Avenue, NW, Room 753  
Washington, D.C. 20530  
(202) 353-9384  
vincent.falvo@usdoj.gov

Date: 5/15/2024

*[signature]*  
Digitally signed by AARON SMITH  
Date: 2024.05.15 13:09:59 -05'00'  
AARON L. SMITH  
Criminal Chief

Date:

*[signature]*  
TYLER BROWN  
Defendant

Date: 5/17/24

*[signature]*  
ELLEN COMLEY  
Counsel for Defendant

Date: 5/17/24

13